UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

ROZLON THOMAS,          `                          Civ. No. 12-47 (DWF/JSM)

      Plaintiff,                                    REPORT AND RECOMMENDATION

v.

UNITEDHEALTH GROUP, INC.,
MARK GWIN,

      Defendants.

      The above matter came before the undersigned on defendants' Motion for Summary Judgment [Docket No. 119].   Plaintiff Rozlon Thomas appeared pro se. Sandra L. Jezierski, Esq. and Melissa Brettingen, Esq. appeared on defendants' behalf. This matter has been referred to the undersigned Magistrate Judge for a Report and Recommendation by the District Court pursuant to 28 U.S.C. §636(b)(1)(A), (B), and Local Rule 72.1(c).

      Plaintiff Rozlon Thomas alleged that her former employer, UnitedHealth Group, Inc. ("UHG") engaged in race discrimination, retaliation, and racial harassment under Title VII of the Civil Rights Act and the Minnesota Human Rights Act ("MHRA"). Amended Complaint, ¶¶68-79 [Docket No. 39].   Thomas further asserted common law claims against UHG for intentional infliction of emotional distress; negligence; negligent supervision, training, retention and hiring; negligent infliction of emotional distress; and intentional interference with an economic advantage.   Id., ¶¶90-13.   Thomas also alleged that Mark Gwin, a co-worker, defamed her.   Id., ¶¶114-118.   For the following reasons, this Court has concluded that summary judgment in defendants' favor is appropriate.

## I.   FACTUAL BACKGROUND[1]

The relevant facts are recited in the light most favorable to Thomas.

Thomas began working for UHG in May 2006 as an Associate Employer Installation Analyst ("Associate Analyst").  Amended Complaint, ¶¶9, 10.  Thomas held this position throughout her employment at UHG.  Declaration of Sandra Jezierski ("Jezierski Decl.") Ex. B (excerpts of the Thomas's deposition) ("Thomas Dep."), pp. 16-21 [Docket No. 129-2].  Christine Wells, Project Director of Business Operations for Account Installations, supervised Thomas and Steve Wieman, Manager of Installation Operations.  Declaration of Christine Wells ("Wells Decl."), ¶2 [Docket No. 124].  Wieman supervised Maria Higgins, Eligibility and Shared Services Group Supervisor, and Candace Hagan, Installation Analyst Group Supervisor, which included the Associate Analysts.  Declaration of Steve Wieman ("Wieman Decl."), ¶5 [Docket No. 123].  The groups reporting to Wieman, Higgins and Hagan all worked in a cubicle environment.  Id.  After Hagan voluntarily resigned in 2009, her position was not refilled and Wieman directly supervised the Associate Analysts, including Thomas.  Id., ¶6.

In early 2009, in an email to Wieman and Hagan, Thomas complained that it was unfair that Caucasian employees were issued laptop computers and allowed to work from home, while African-American employees were not.  Id., ¶10, Thomas Dep., p. 69.  Thomas made this same complaint to UHG's "HRdirect"[2] in February, 2009.  Id., p. 71.

---

[1]   The facts cited in this section were gleaned from Thomas's Amended Complaint and the declarations and exhibits submitted by UHG in support of its motion.  As set out in greater detail, Thomas submitted no written materials in response to UHG's motion.

[2]   The parties did not describe "HRdirect," but the Court assumed it was some entity associated UHG's human resources function.

Thomas's complaint was investigated by Hagan and HRdirect. Wieman Decl., ¶¶10, 18. Two Caucasian employees on Hagan's team had been allowed to work from home: Christy Yakel, as a medical accommodation; and Sharon Wegener, who lived over 70 miles from work, as a weather–related accommodation. Id., ¶10. Wegener had worked at home five days in the previous year. Declaration of Sharon Wegener ("Wegner Decl."), ¶11 [Docket No. 128]. The findings of the investigation were communicated to Thomas. Jezierski Decl., Ex. C.

On or about May 8, 2009, Hagan told Wieman that Thomas's co-workers had complained that Thomas was talking loudly on the phone, making negative statements about management, and stating that she was "pissed." Wieman Decl., ¶11. Thomas was overheard the next day, again talking loudly and disruptively. Id.; Thomas Dep., Ex. 8 (UHG Group Corrective Action Plan) ("CAP")). Hagan investigated and determined that "70% of the employees in the area were disturbed and/or uncomfortable by Rozlon's behavior."[3] Thomas Dep., Ex. 8, p. 1. Thomas admitted saying on the phone "Steve don't help me, he doesn't do anything, I'm pissed." Thomas Dep., p. 102; see also Transcript of Hearing (Tr.), p. 18 ("And I did say I was pissed. I told the director that."). Wieman met with Thomas on May 15, 2009, and warned her that she was expected to present herself in a professional manner. Wieman Decl., ¶12. UHG placed Thomas on a CAP. Id.; Thomas Dep., Ex. 8. As part of the CAP, Wieman agreed to meet with Thomas every other week to resolve any questions or issues she had. Id., ¶13, Thomas Dep., Ex. 8, p. 2.

---

[3] At the motion hearing, Thomas argued that this was untrue and that Higgins was actively "trying to convince" employees to say that they heard Thomas being disruptive. Tr., pp. 22-23. There is no evidence to support this statement.

On June 19, 2009, Thomas appealed her CAP through UHG's Internal Dispute Resolution ("IDR") process. Wieman ¶15, Ex. 1 (IDR policy), Thomas Dep., Ex. 9 (IDR filing form). In her IDR complaint, Thomas alleged that Hagan placed her on the "unfounded" CAP in retaliation for "asserting [her] civil rights." Thomas Dep., Ex. 9. Thomas amended her IDR complaint on July 1, 2009, this time alleging that she was placed on the CAP in retaliation for her February, 2009 internal complaint about Caucasian co-workers working from home. Thomas Dep., pp. 117-118, Ex. 10 (Amended IDR filing form). Thomas additionally stated that Hagan treated African-American employees unfavorably, creating a hostile work environment. Thomas Dep., Ex. 10.

Hagan and Higgins investigated the complaints about Thomas's conduct that led to the CAP and "verified that she did engage in an inappropriate conversation that negatively impacted a large majority of the employees who overheard it." Wieman Decl., ¶16. In connection with her amended IDR complaint, Thomas met with Hagan and Nicolyn Neighbors of HRdirect on July 8, 2009. Thomas Dep., Ex. 11 (letter to Thomas from Hagan dated July 10, 2009, summarizing meeting). In the letter summarizing the meeting, Hagan confirmed that Thomas had raised removing the CAP from her personnel file and being issued a laptop computer so she could work at home. Id. Hagan stated that no other member of the department was allowed to work from home, or had access to a laptop computer, but that from time-to-time, Wegener had been allowed to work from home due to inclement weather, and Yakel had a medical condition that necessitated working from home. Id. Hagan further noted that Thomas's

phone call on May 6, 2009, had been disruptive and negatively impacted her co-workers.  Id.  As a result, UHG would not remove the CAP.  Id., Wieman Decl., ¶16.

On June 22, 2009, Wieman received an email from Karla Cannizzaro, Group Installation Analyst, regarding Thomas.  Wieman Decl., ¶14.  Cannizzaro, who reported to Wieman, wrote that Thomas had another loud, disruptive telephone call on June 19, 2009, during which Thomas made derogatory comments regarding UHG's management team and co-workers, including Cannizzaro, and that she was overheard telling a co-worker that "the company sucks, and it is full of the blame game."  Id.

On July 23, 2009, Thomas filed a Step 2 IDR.  Thomas Dep. Ex. 12 (level 2 appeal, IDR process).  Thomas sought the removal of the CAP and stated "Black employees are [not] given the same opportunities for promotions and working at home as white employees."  Id.  Lisa DeLeon, HRdirect representative, and Wieman investigated Thomas's Step 2 IDR complaint.  Wieman Aff., ¶18.  Wieman and DeLeon found Thomas's complaints unsupported and refused to remove the CAP.  Id.  Wieman sent a letter to Thomas informing her of the outcome of the Step 2 investigation on August 26, 2009.  Id.; Thomas Dep., Ex. 13.

On January 20, 2010, Thomas called HRdirect and complained that Caucasian employees were allowed to work from home.  Jezierski Decl., Ex. D (Thomas's complaint to HRdirect).  Thomas also alleged that she had been demoted, work was unequally allocated, and co-worker Wegener was "unfairly" auditing her work.  Id.  Thomas again alleged that white employees had been issued laptop computers and were allowed to work from home, although she stated that this practice stopped after she complained about it.  Id., p. 3.  Thomas also complained that Wegener should not

be auditing her work "when Wegener is clearly retaliating against her for filing a report about discrimination." Id. Thomas also claimed she had been demoted and that Yakel and Wegener had suggested a change to the way departmental statistics were kept that would disadvantage Thomas. Id.

Wells investigated Thomas's allegations. Wells Decl. ¶4. Wells concluded that Thomas had not been demoted. Id., ¶5. Rather, sometime in 2008, UHG mistakenly coded the Associate Analyst position as Senior Employer Installation Analysts. Wieman Decl. ¶8; Wells Decl. ¶5. When the mistake was discovered in June 2008, UHG re-coded the position back to the correct title. Id. The change in title did not impact salaries, benefits, duties, or grade levels of any employees. Wells Decl., ¶5. Further, Wells determined that the work load was distributed by client based on the number of plan documents, such that each Associate Analyst processed a comparable amount of documents, even if he or she had a greater number of clients. Wells Decl. ¶6, Ex. 1 (email from Wells to Michele Smith dated March 1, 2010); Wieman Decl., ¶9. Sometime in September, 2009, Wieman assigned Wegener to conduct internal reviews of all of the work performed by all Associate Analysts, not just Thomas. Wieman Decl., ¶19; Wegener Decl., ¶¶4-10. This audit was prompted by a complaint one of Thomas's clients made to Wieman about repeated mistakes in Thomas's work. Wieman Decl., ¶19. "Scores" from the audit were not tracked and employees were not disciplined for errors discovered during the audit. Id., ¶20; Wegener Decl., ¶6.

Wells met with Thomas on or about February 16, 2010, to communicate the results of her investigation and also informed HRdirect representative Michele Smith of the results. Wells Decl., ¶5, Ex. 1 (email from Wells to Smith dated March 1, 2010).

On February 4, 2010, Wegener sent an email to Wieman and stated "Steve Could you please talk to Rozlon and ask her to lower her volume?  It is very disrupting. I can hear her even with my headphones on."  Thomas Dep., Ex. 29 (email from Wegener to Wieman dated February 4, 2010); Wegener Decl., ¶12.

On March 8, 2010, Higgins and Cannizzaro told Wieman that Thomas had a loud and distracting phone call on March 5, 2010, stating, among other things: "Christy [Yakel] should get her fat but[t] in here and work like the rest of us.  She doesn't know who she is talking to;" "HR is worthless" so she (Thomas) filed a lawsuit and was trying to talk others into it; and "management is out to get me fired that's why they track our metrics with the PIF tracker."  Thomas Dep., Ex. 30 (email from Wieman to Rachel Meinert dated December 21, 2010, recounting what Cannizzaro and Higgins told him on March 8, 2010); Wieman Decl., ¶22.  Wieman warned Thomas that this conduct was inappropriate and that she was expected to act professionally.  Wieman Decl., ¶22.

On March 24, 2010, Thomas placed an email in the group email box.[4]  Thomas Dep. Ex. 15 (email from Thomas).  In the email, Thomas accused Wegener of "lying" and "sabotaging" her work when Wegener indicated that Thomas had made some errors in her work, which Thomas denied.  Id.; Wieman Decl., ¶23.  While investigating the matter, Wieman asked Thomas if she sent the email.  Wieman Decl., ¶23.  Thomas could not recall having sent the email, but later, when she was shown a copy, she told Wieman that he was not supposed to have seen it and that she was merely "venting." Id.; Thomas Dep., p. 146.

---

[4]     This email is addressed "from" Thomas, and "to" Thomas.  Thomas Dep., Ex. 15. Apparently Thomas sent the email to everyone in her department.

On April 15, 2010, Cannizzaro and Mark Gwin, Group Installation Analyst, reported to Wieman that Thomas had engaged in another loud and distracting phone call, making them uncomfortable.  Wieman ¶24; Thomas Dep. Exs. 14 (Elevated CAP), 30 (email from Wieman to Meinert dated December 21, 2010).  On May 6, 2010, after consulting with HRdirect, Wieman placed Thomas on a 90-day Elevated CAP for inappropriate conduct.  Thomas Dep. Ex. 14 (Elevated CAP); Wieman Decl. ¶25.  In her comments on the Elevated CAP, Thomas remarked that it was untrue that she had been speaking badly about UHG, Wegener – a "hostile white co-worker" – should not be auditing her work, and Wieman was discriminating and retaliating against her.  Thomas Dep., Ex. 14.  Thomas alleged that Wieman backdated the CAP because he had received a call from another manager from UHG for a reference for Thomas.  Id.  Wieman denied that was so.  Wieman Decl., ¶25.  Thomas sent an email to Carol Cordell, an HRdirect representative, with a list of complaints but she did not file an official IDR complaint.  Id., ¶8.  Wells made several attempts to meet with Thomas, but Thomas declined Wells' meeting invitations.  Id.  Wells concluded that some of the issues Thomas raised had already been investigated and deemed unfounded.  Id., ¶9.  Wells also investigated Thomas's new allegations: (1) Hagan was forced to write Thomas's Initial CAP and was then forced to resign; (2) Wieman backdated the Elevated CAP to prevent Thomas from seeking a promotion; and (3) Thomas was denied a promotion because of the elevated CAP.  Id., ¶10.  Wells found that Hagan consulted with Wieman on the CAP and resigned her position voluntarily; Wells concluded that Wieman opened Thomas's Elevated CAP on May 4, 2010, not knowing that Thomas had applied for another position; and Wells concluded that the Elevated

CAP would stand and that Thomas's allegations about why she was denied a promotion lacked merit. <u>Id.</u> Wells communicated the results of her investigation to Thomas. <u>Id.</u>

While still on the Elevated CAP, Thomas was overhead in a July 13, 2010 telephone call to say "they might as well be putting dogs on us" and "they are gonna get lesson 101 from me." Wieman Decl., ¶26. On July 29, 2010, Gwin told Wieman that Thomas made another loud telephone call in which she stated, "I hope they do fire me, then I can file a wrongful termination suit" and "this company is gonna get their paycheck. I'm just gonna wait them out." <u>Id.</u>, ¶27. Wieman closed the Elevated CAP and placed Thomas on a Final CAP on August 17, 2010. <u>Id.</u>, ¶28, Thomas Dep., Ex. 18 (Final CAP).

In September, 2010, after Thomas was placed on the Final CAP, Wells held a "town hall" meeting for the Account Installations Department to discuss departmental issues. Wieman Decl., ¶30; Wells Decl., ¶11. At that meeting, Thomas was observed talking with co-workers, facing the wall while Wells was speaking, and from Wells' perspective, generally being disrespectful during the meeting. Wells Decl., ¶11. At the end of the meeting, Wells directed Wieman to discuss with Thomas and others who were engaging in the same conduct, how their behavior was inappropriate. <u>Id.</u> Wieman and Thomas met on September 15, 2010, and Carla Supanich from UHG appeared by telephone. Wieman Decl., Ex. 2 (notes of meeting prepared by Supanich). Wieman stated that Thomas's conduct during meetings had been unacceptable and that he and Supanich expected Thomas to exhibit polite and respectful behavior. <u>Id.</u> Wieman told Thomas that any violation of this directive would be cause for immediate termination.

Id.; Wieman Decl., ¶30.  Thomas stated that she understood the need to be respectful in the office.  Wieman Decl., Ex. 2.

On October 27, 2010, Wieman received an email from Gwin in which Gwin stated that Thomas "continues to be a disturbance in the office."  Gwin Decl., ¶4, Ex. 1 (email dated October 27, 2010, from Gwin to Wieman).  Gwin reported that Thomas was complaining about where she was sitting in the department (adjacent to the manager and supervisor), how they needed to hear what she was saying, and "mostly making derogatory comments about the management."  Id.

In the spring of 2010, Thomas had applied for the position of Accumulator Research Analyst.  Wieman Decl., ¶33.  Narciza Rider was the hiring supervisor for the position and Wieman sat in on the interviews.  Id.  Rider was the sole decision-maker with respect to the hiring decision.  Id.; Declaration of Narciza Rider ("Rider Decl."), ¶4 [Docket No. 126].  Rider interviewed Thomas on April 7, 2010, but did not select her for the position.  Rider Decl., ¶5; Wieman Decl., ¶33.  According to Rider, she hired the individuals she believed were the most qualified and the best fit for the position, and did not select Thomas because Thomas was not as qualified as the other individuals who were hired.  Rider Decl., ¶5.  Wieman noted that none of the four individuals hired had been on CAPS for engaging in disruptive, insubordinate behavior.  Wieman Decl., ¶33.

Thomas also applied for the position of Insurance Services Consultant on March 22, 2010.  Thomas Dep., Ex. 34 (Thomas's application for Insurance Services Consultant position).  Wieman was unaware that Thomas applied for or was interviewing for the position.  Wieman Decl., ¶¶25, 34; Thomas Dep., pp. 164-165.  The hiring manager, James Assali, interviewed Thomas.  Thomas Dep., p. 283.  Thomas

testified that there was no reason to think that Assali knew of Thomas's internal complaints. Id. On May 3, 2010, the requisition for the position was closed with no hire. Thomas Dep., Ex. 33 (job requisition). Thomas's Amended Complaint implied that she applied for two additional positions, but Wells has stated under penalty of perjury that Thomas did not apply for the positions she referenced. See Amended Complaint, ¶45, n. 19; Wells Decl., ¶13.

On October 29, 2010, Higgins reported to Lisa Woolery, HRdirect representative, that during an October 27 team meeting, Thomas and another employee sat as far away from Wells, the speaker, as possible, had their heads down the whole time, and passed notes back and forth. Wells Decl., ¶12; Jezierski Decl., Ex. G (email from Higgins to Woolery dated October 29, 2010, detailing behavior by Thomas at the team meeting and asking Woolery "how long [do] we let this go on?").

In November 2010, Tyler Moore, Vice President of Shared Service Operations, visited UHG's Bloomington office in connection with a corporate realignment under his leadership. Declaration of Tyler Moore ("Moore Decl."), ¶¶1-4 [Docket No. 125]. Moore met with Wieman, Sharon McCullough, Associate Vice President of Installation & Maintenance Operations, Higgins, Supanich and Meinert. Id., ¶4. Moore stated that during that meeting he learned that the department was struggling with a problem employee, identified as Thomas. Id. Moore learned that Thomas had been placed on a Final CAP and after the Final CAP was opened, Thomas had behaved disrespectfully to Wells at the team meeting. Id., ¶9. Moore also learned that Wieman was in the process of recommending Thomas's termination because she had continued to engage in disruptive and disrespectful behavior after being placed on the Final CAP. Id., ¶8.

Based on Thomas's failure to comply with the terms of the Final CAP, Moore agreed that she should be terminated – a decision that was approved by Employee Relations and Human Capital. Id., ¶¶10, 11. On November 5, 2010, Moore met with Thomas and informed her that due to her failure to meet the expectations reflected in the Final CAP, she was being terminated effective immediately. Id., ¶14. Moore did not know Thomas's race before terminating her. Id., ¶13.

Thomas filed an IDR complaint five days later, which was immediately elevated to Step 3 pursuant to UHG policy. Thomas Dep., p. 230, Exs. 21 (complaint by Thomas to Moore dated November 10, 2010, asking for a "fair investigation" of disparate treatment of African-American employees reporting to Wieman and McCollough); 22 (email from Thomas to Nicole Linbeck dated November 8, 2010, regarding her termination); 23 (email from Linbeck to Thomas dated November 10, 2010, telling Thomas that her IDR automatically escalated to Step 3 upon termination). Thomas complained that she was terminated while her previous IDR complaint regarding the town hall meeting was pending. Thomas Dep., Ex. 23. Thomas also complained that she was wrongfully terminated in retaliation for making complaints about discrimination; her work quality was high and, therefore, the CAPS were not justified; and the CAPS were part of a pattern of discrimination aimed at African-American employees. Thomas Dep., Ex. 25 (letter from Lloyd Dyer, Chief Operating Officer of Thomas's division, to Thomas dated January 18, 2011). Dyer investigated Thomas's Step 3 IDR complaint and determined that her termination was warranted based on Thomas's pattern of disruptive behavior. Thomas Dep., pp. 239-240, Ex. 25. Dyer wrote that he had reviewed all of the CAPS, Thomas's IDR filings, and the complaints from Thomas's co-

workers.  Id.  Dyer also spoke with Supanich and Wells.  Id.  Based on this information, Dyer determined that Thomas's termination would stand.  Id.  Dyer did not find merit in Thomas's contention that her termination was retaliatory, instead finding that she had failed to comply with the conditions in the Final CAP by behaving disruptively as late as October, 2010.  Id.  As to Thomas's complaint that her work was of high quality, Dyer stated that Thomas was not placed on the CAPs because of work quality issues, but because of inappropriate workplace behavior.  Id.  Regarding Thomas's allegation that the CAPS were part of a pattern of discrimination against African-American employees, Dyer concluded that it was Thomas's behavior and not a pattern of discrimination by management that led to her termination.  Id.  Dyer rejected Thomas's request that she be reinstated with compensation for the time she had been off work.  Id.

In summary, Thomas was placed on an Initial CAP on May 21, 2009, for disruptive conduct.  Thomas Dep., Ex. 8.  On May 6, 2010, Wieman placed Thomas on a 90-day Elevated CAP for inappropriate conduct.  Id., Ex. 14.  On August 17, 2010, Wieman placed Thomas on a Final CAP.  Id., Ex. 18.  The Final CAP provided that "[t]his warning is to be considered a onetime final warning" and "another incident of inappropriate conduct (negative statements, distracting behavior, angry outbursts, or challenging the company to terminate her) may result in immediate termination."  Id. Moore terminated Thomas on November 5, 2010.  Moore Decl., ¶14.  At that time, Wieman and others were in the process of recommending Thomas's termination.  Id., ¶8.

Thomas filed three charges of discrimination with the Equal Employment Opportunity Commission ("EEOC") dated October 2, 2009, June 22, 2010, and January

19, 2011.   Amended Complaint, ¶5.   On October 31, 2011, the EEOC dismissed Thomas's charges with findings of no probable cause.   Jezierski Decl., Ex. H (EEOC Dismissal and Notice of Rights).   Thomas commenced this lawsuit on January 6, 2012. See Complaint [Docket No. 1].

## II.   LEGAL STANDARDS

### A.   Thomas's Failure to Respond to Defendants' Motion for Summary Judgment

Thomas did not respond to defendants' motion for summary judgment, which was filed and served on April 1, 2014.   On May 28, 2014, this Court's judicial assistant sent Thomas an email regarding her lack of response and asking Thomas to respond by return email if and when she planned to respond to UGH's motion.   Thomas did not respond to this email.   Thomas appeared at the hearing on June 3, 2014, and explained that she did not respond because she did not have access to a computer at home, did not have email, and was working ten hours a day.   Tr., pp. 5, 17, 25-26.   The Court stated: "That didn't prevent you from responding [to the motion] in handwriting; is that correct?"   Thomas responded:   "No, it didn't . . . I could have done that."   Tr., pp. 6-7. Thomas further stated that rather than respond in writing, she "thought [she] would come here to the hearing today to explain my side."   Id., p. 6.   Thomas also stated that she believed that defendants were required to meet and confer with her before the motion.   Tr., p. 6.

Thomas has long shown that she is a sophisticated pro se litigant.   For example, Thomas has filed and responded to many motions in this case.   See, e.g. Docket Nos. 24 (Plaintiff's Motion to Amend Complaint), 42 (Plaintiff's Motion to Compel Discovery), 66 (Plaintiff's Letter Request for Leave to File a Motion for Reconsideration); 72

(Plaintiff's Second Motion to Compel and for Sanctions); 90 (Plaintiff's Memorandum in Opposition to Defendant's Motion to Compel Discovery); 102 (Plaintiff's Letter Request for Leave to File a Motion for Reconsideration); 104 (Plaintiff's Motion to Compel Discovery).   It was clear to this Court that Thomas chose not to respond to UHG's motion because she was busy and would have been inconvenienced by handwriting a response or borrowing a computer.   Thomas never contacted UHG's counsel or this Court seeking additional time to respond in light of her lack of access to a computer.

Thomas's excuse that she expected defendants to contact her for a meet-and-confer is also meritless.  Local Rule 7.1 does not require a meet-and-confer before filing a motion under Rule 56.   Further, under no circumstances does the meet-and-confer requirement for motions other than summary judgment and temporary restraining orders excuse a party from responding to a motion.   Thomas's excuses for not responding are unavailing.   <u>See</u> <u>Wickelgren v. Midwest Special Servs., Inc.</u>, Civ. No. 09-3729(RHK/JSM), 2011 WL 743010, at *1 (D. Minn. Feb. 23, 2011) (<u>pro</u> <u>se</u> status does not excuse a litigant from responding to a motion for summary judgment.)

Notwithstanding Thomas's failure to respond, defendants, as the moving parties, still have the burden of showing that there are no genuine issues of material fact and that, as a matter of law, they are entitled to summary judgment.   <u>See</u> <u>Mack v. Dillon</u>, 594 F.3d 620, 622 (8th Cir. 2010) ("[F]ailure to respond to [a] summary judgment motion does not automatically compel resolution in favor of [the] moving party; [the] reviewing court must still determine whether entry of summary judgment was appropriate.") (citing <u>United States v. One Parcel of Real Property, Located at 9638 Chicago Heights, St. Louis, Mo.</u>, 27 F.3d 327, 329 n. 1 (8th Cir. 1994) (failure to respond to a motion for

summary judgment "does not automatically compel resolution of the appeal in favor of the [moving party] . . . a reviewing court must still determine whether the district court's entry of summary judgment was appropriate.")); see also Soliman v. Johanns, 412 F.3d 920, 922 (8th Cir. 2005) ("As to the merits, we must determine whether entry of summary judgment was proper despite [the plaintiff's] failure to respond to the motion."), cert. denied, 549 U.S. 865 (2006).

Therefore, to address defendants' motion, the Court has not only made a searching review of the record, but has considered the arguments made by Thomas at the motion hearing.[5]  See Tr., pp. 17-25.

## B.  <u>Summary Judgment Standard</u>

Summary judgment is proper if, drawing all reasonable inferences favorable to the non-moving party, there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c); Celeotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249-50 (1986); see also Unigroup, Inc. v. O'Rourke Storage & Transfer Co., 980 F.2d 1217, 1219 (8th Cir. 1999).  "'Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.'" DePugh v. Smith, 880 F. Supp. 651, 656 (N. D. Iowa 1995) (quoting Anderson, 477 U.S. at 248).  "[I]f the court can conclude that a reasonable trier of fact could return a verdict

---

[5]     At the hearing, the Court noted that under Local Rule 7.1(g), the Court has the option of "of cancelling the hearing and considering the matter submitted without oral argument; to reschedule the hearing; to hold the hearing but refuse to permit oral argument by the party who failed to file; to award reasonable attorneys' fees to the opposing party; to take some combination of these actions or to take any other action that the Court considers appropriate."  Tr. 4.  The Court ultimately allowed Thomas to respond orally to defendants' arguments.

for the nonmovant, then summary judgment should not be granted."  Id. at 656 (quoting Anderson, 477 U.S. at 248).

The moving party bears the burden of showing that the material facts in the case are undisputed.  Celotex Corp., 477 U.S. at 322-23; see also Mems v. City of St. Paul, Dep't of Fire & Safety Servs., 224 F.3d 735, 738 (8th Cir. 2000).  If the moving party has carried its burden, the non-moving party must demonstrate the existence of specific facts in the record that create a genuine issue for trial.  Anderson, 477 U.S. at 256; Krenik v. County of LeSueur, 47 F.3d 953, 957 (8th Cir. 1995).  "The nonmoving party may not rest on mere allegations or denials, but must show through the presentation of admissible evidence that specific facts exist creating a genuine issue for trial." Minnesota Laborers Health & Welfare Fund v. Swenke, 2003 U.S. Dist. LEXIS 11439, *4-5 (D. Minn. 2003) (citations omitted).

Summary judgment is appropriate where the material facts are not in dispute, and the court need only apply the law to the facts in the record.  See Eisenrich v. Minneapolis Retail Meat Cutters, 282 F. Supp. 1077, 1080-81 (D. Minn. 2003) (citing Oldham v. West, 47 F.3d 985, 988 (8th Cir. 1995)).

"While employment discrimination cases are often fact intensive and dependent on nuance in the workplace, they are not immune from summary judgment, and there is no separate summary judgment standard for employment discrimination cases." Fercello v. Cnty. of Ramsey, 612 F.3d 1069, 1077 (8th Cir. 2010).

III.    **DISCUSSION**

A.    <u>**Discrimination Claims**</u>

Thomas alleged that UHG's conduct towards her constituted discrimination in employment on the basis of race and hostile work environment under both Title VII and the MHRA.   Amended Complaint, ¶¶72, 73.   Thomas also alleged that UHG and its employees retaliated against her for refusing to "go along with" its discriminatory and harassing behavior for making complaints of race discrimination.   <u>Id.</u>, ¶68.   In doing so, UHG created a hostile work environment.   <u>Id.</u>, ¶¶68, 69, 72, 75. [6]

1.    **Race Discrimination**

Title VII of the Civil Rights Act of 1964 (Title VII) makes it "an unlawful employment practice for an employer . . . to discharge any individual or otherwise to discriminate against any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin."   42 U.S.C. § 2000e-2(a)(1).   Similarly, the MHRA

---

[6]    Claims for race discrimination, hostile work environment and failure to promote under Title VII and the MHRA are analyzed using the same standard.   <u>See</u> <u>Kennedy v. Heritage of Edina, Inc.</u>, Civ. No. 13-71 (DSD/JJG), 2014 WL 3828167, at *2, n. 3 (D. Minn. Aug. 4, 2014) (analyzing race and national origin discrimination under Title VII and the MHRA using the same standard) (citing <u>Torgerson v. City of Rochester</u>, 643 F.3d 1031, 1043 (8th Cir. 2011), <u>Clearwater v. Independent Sch. Dist. No. 166</u>, 231 F.3d 1122, 1124, n. 2 (8th Cir. 2000)); <u>Hanenburg v. Principal Mut. Life Ins. Co.</u>, 118 F.3d 570, 574 (8th Cir. 1997) ("In analyzing cases under the MHRA, the state courts apply the principles developed in the adjudication of claims under Title VII because of the substantial similarities between the two statutes."); <u>Ulrich v. Mid-Minnesota Legal Assistance</u>, Civ. No. 07-1309 (ADM/JSM), 2008 WL 2891020, at *5 (D. Minn. July 22, 2008) (applying analysis of plaintiff's Title VII claim for failure to promote to MHRA claims); <u>LaMont v. Independent Sch. Dist. No. 728</u>, 814 N.W.2d 14, 22-23 (Minn. 2012) (analyzing MHRA hostile work environment claims under Title VII standard); <u>Fletcher v. St. Paul Pioneer Press</u>, 589 N.W.2d 96, 101 (Minn. 1999) ("In construing the MHRA, we apply law developed in federal cases arising under Title VII of the 1964 Civil Rights Act.") (citations omitted)

makes it unlawful for an employer to "discharge an employee" or "discriminate against a person with respect to hiring, tenure, compensation, terms, upgrading, conditions, facilities, or privileges of employment" because of an employee's race, color, creed, religion, national origin, sex, marital status, . . . ."  Minn. Stat. § 363A.08, subd. 2.  The Court analyzes an employer's liability under both Title VII and the MHRA using the same legal standards.  See Torgerson, 643 F.3d at 1043.

Thomas can survive summary judgment either by offering direct or indirect evidence of discrimination.  See Fjelsta v. Zogg Dermatology, PLC, 488 F.3d 804, 809-810 (8th Cir. 2007).  Direct evidence is "'evidence showing a specific link between the alleged discriminatory animus and the challenged decision, sufficient to support a finding by a reasonable fact finder that an illegitimate criterion actually motivated the adverse employment action.'"  Id. (quoting Griffith v. City of Des Moines, 387 F.3d 733, 736 (8th Cir. 2004)); see also Schierhoff v. GlaxoSmithKline Consumer Healthcare, L.P., 444 F.3d 961, 966 (8th Cir. 2006) ("Direct evidence includes evidence of conduct or statements by persons involved in the decision making process that may be viewed as directly reflecting the alleged discriminatory attitude where it is sufficient to support an inference that discriminatory attitude more likely than not was a motivating factor.") (internal citation omitted).  Direct evidence may be based on oral or written statements by an employer that show discriminatory intent, such as a statement by a person responsible for promotion decisions that "'if it was his company, he wouldn't hire any black people.'"  Davison v. City of Minneapolis, 490 F.3d 648, 664 (8th Cir. 2007) (quoting EEOC v. Alton Packaging Corp., 901 F.2d 920, 923-25 (11th Cir. 1990)).

When analyzing indirect evidence, the court applies the burden-shifting framework set forth in <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792 (1973). <u>Griffith</u>, 387 F.3d at 736-37; <u>Edwards v. Hopkins Place Ltd. P'ship.</u>, 783 N.W.2d 171, 175 (Minn. 2010) ("A plaintiff may show discrimination under the MHRA by using the <u>McDonnell Douglas</u> burden-shifting framework."). At the summary judgment stage, the issue is "'whether the plaintiff has sufficient evidence that unlawful discrimination was <u>a</u> motivating factor in the adverse employment action.'" <u>Roberts v. Park Nicollet Health Servs.</u>, 528 F.3d 1123, 1127 (8th Cir. 2008) (quoting <u>Griffith</u>, 387 F.3d at 735 (emphasis in original). If so, then "the presence of additional legitimate motives will not entitle the defendant to summary judgment." <u>Id.</u>

Viewing the evidence in the light most favorable to Thomas, no direct evidence was presented that UHG discriminated against her on the basis of her race. As a result, the Court analyzed her claims under the <u>McDonnell Douglas</u> framework.

The <u>McDonnell Douglas</u> framework requires an employee to bear the initial burden of establishing a <u>prima facie</u> case of discrimination, after which the burden shifts to the employer to articulate a legitimate, non-discriminatory reason for its actions. <u>McGinnis v. Union Pac. R.R.</u>, 496 F.3d 868, 873 (8th Cir. 2007); <u>Aase v. Wapiti Meadows Cmty. Tech. & Servs., Inc.</u>, 832 N.W.2d 852, 856 (Minn. Ct. App. 2013) (applying <u>McDonnell Douglas</u> burden shifting framework to MHRA discrimination claim). To establish a <u>prima facie</u> case of race discrimination, Thomas must show: (1) she is a member of a protected class; (2) she was meeting UHG's legitimate expectations; (3) she suffered an adverse employment action; and (4) a similarly situated person outside her protected class was treated more favorably. <u>Box v. Principi</u>, 442 F.3d 692, 696 (8th

Cir. 2006) (citing <u>Gilmore v. AT & T</u>, 319 F.3d 1042, 1046 (8th Cir. 2003)).  "Once this <u>prima facie</u> case is established, the burden shifts to the employer to provide a legitimate reason for the adverse employment action.   Then, the burden shifts back to the employee to demonstrate that the reason articulated by the employer was a pretext." <u>Gilmore</u>, 319 F.3d at 1046 (citations omitted).   It is undisputed that Thomas, who is African American, is a member of a protected class and that by her termination, she suffered an adverse employment action.[7]   Therefore, the Court focused it analysis on the second and fourth prongs of the <u>prima facie</u> case.

UHG asserted that it had a legitimate reason to expect Thomas to conduct herself professionally in the office, refrain from disrupting her co-workers, and heed UHG's warnings about her misconduct.   UHG Memorandum in Support of Motion for Summary Judgment ("Defs.' Mem."), p. 22 [Docket No. 121].   The evidence shows that

---

[7]     Thomas also alleged that Caucasian co-workers were issued laptop computers and were allowed to work from home, while she and other African-American workers were not, (Amended Complaint, ¶¶13-17), and that consequently, she was treated adversely with respect to "work related privileges."  Amended Complaint, ¶69.  Failure to issue Thomas a laptop computer or to allow her to work at home, does not constitute an adverse action sufficient to state a <u>prima facie</u> case of race discrimination.  "Adverse actions" must be "harmful enough that a reasonable employee would find it materially adverse."  <u>Young-Losee v. Graphic Packaging Int'l, Inc.</u>, 631 F.3d 909, 912 (8th Cir. 2011).  "Materially adverse" "means conduct that might dissuade a reasonable worker from engaging in protected conduct."  <u>Id.</u>  "Minor changes in duties or working conditions, even unpalatable or unwelcome ones, which cause no materially significant disadvantage, do not" constitute adverse employment actions.  <u>Clegg v. Arkansas Dep't. of Corr.</u>, 496 F.3d 922, 927 (8th Cir. 2007).  However, assuming these allegations were designed to support her claims of race discrimination with respect to her termination, the only evidence before this Court is that Thomas's complaints about these practices were investigated and that UHG concluded that one Caucasian employee (who lived approximately 70 miles away) was periodically allowed to work from home in inclement weather, and another Caucasian employee (who had a medical condition) was allowed to work from home. Wieman Decl., ¶10.  Thomas submitted no evidence and the Court could find no evidence to contradict UHG's explanation for allowing these two employees to work from home and use a laptop computer.

UHG placed Thomas on successive CAPs because of her disruptive conduct – conduct that continued after she had been placed on a Final CAP and was told that any further disruptive conduct could result in her termination.   Thomas Dep., Ex. 18.   Although Thomas denied that some of the incidents occurred, she admitted that she had a workplace telephone call in which she stated "Steve [Wieman] don't help me, he doesn't do anything.   I'm pissed," (Thomas Dep., p. 102); she put an inappropriate email in her department's group mailbox, (id., p. 146); and "it could have happened" that she spoke negatively about Wieman on the phone.   Id., p. 159.   Viewing the evidence in the light most favorable to Thomas, the undisputed facts are that Thomas engaged in disruptive behavior, and, therefore, she was not meeting her employer's legitimate expectations.[8] See Robinson v. American Red Cross, 753 F.3d 749, 755 (8th Cir. 2014) (an employee was not meeting her employer's legitimate expectations when there were complaints from the public about her lack of professionalism, she used profanity in the workplace, and made false accusations against co-workers); McLeod v. South Washington County Schs., Civ. No. 05-764 (DWF/JJG), 2006 WL 2472115, *7 (D. Minn. Aug. 26, 2006) (an employee who engages in disruptive and disrespectful behavior is "not performing her duties in a way that the employer legitimately expected.").

Thomas has also failed to prove that similarly situated persons outside her class were treated more favorably.   To be considered similarly situated, the comparators must be "similarly situated in all relevant respects," meaning that "they are involved in or

---

[8]    The Amended Complaint alleged that Thomas "exceed[ed] her job expectation" and was assigned over 90% of the caseload in her department.   Amended Complaint, ¶11.   While these allegations do not constitute evidence, the evidence before the Court did show that UHG did not terminate Thomas for poor work performance, but for disruptive conduct in the workplace.

accused of the same offense and are disciplined in different ways." Riser v. Target Corp., 458 F.3d 817, 821 (8th Cir. 2006) (citing Rodgers v. U.S. Bank, N.A., 417 F.3d 845, 856 (8th Cir. 2005)), cert. denied, 549 U.S. 1253 (2007).  Thomas admitted that she did not know of anyone who engaged in the same behavior as was documented in her CAPs, and who was not disciplined.  Thomas Dep., pp. 325-326.  Nor was there any evidence in the record that this was so.  Therefore, Thomas failed to establish all elements of her prima facie case of race discrimination, and summary judgment should be granted on that basis.

### 2.   Failure to Promote[9]

To establish a prima facie case of discriminatory failure to promote, Thomas must show that "she was qualified for the promotion for which she applied and it was given to a similarly situated employee who was not part of the protected class." Robinson, 753 F.3d at 754; Mems, 327 F.3d at 785 ("The elements of a prima facie case for failure to promote [under the MHRA] are: (1) plaintiff is a member of a protected group; (2) plaintiff was qualified and applied for a promotion to a position for which the employer was seeking applicants; (3) despite his qualifications, he was rejected; and (4) other employees of similar qualifications who were not members of a protected group were promoted at the same time plaintiff's request for a promotion was denied.").  "Courts may not second guess employers' business decisions, however, and

---

[9]   Thomas did not allege discriminatory failure to promote as a separate count in her Amended Complaint, but the Amended Complaint made several references to UHG's failure to promote her.  See e.g. Amended Complaint, ¶¶38, 39.  Additionally, Thomas argued at the motion hearing about UHG's failure to promote her.  Tr., pp. 21-22.  In light of Thomas's pro se status, the Court has read the Amended Complaint liberally and has construed some of her allegations to relate to discriminatory failure to promote.  See Alshire v. Darnell, 508 F.2d 526, 528 (8th Cir. 1974) (stating that pro se civil rights complaints are entitled to liberal construction).

employers are free to make employment decisions so long as they do not discriminate unlawfully." Robinson, 753 F.3d at 754 (internal citation and quotation marks omitted).

Despite some references by Thomas that she applied for two positions with requisition numbers 330677 and 339282, (Amended Complaint, ¶45, n. 19), there is no evidence that she ever applied for these positions. Therefore, Thomas cannot meet the second prong of the prima facie case with respect to those two positions. See McClure v. Career Sys. Dev. Corp., 447 F.3d 1133, 1135 (8th Cir. 2006) (to "establish a prima facie failure-to-promote claim, a plaintiff ordinarily must show . . . 'she applied for the promotion and was rejected.'"), quoting Lockridge v. Board of Trs. of Univ. of Ark., 315 F.3d 1005, 1010 (8th Cir. 2003) (en banc)).

As to the Insurance Services Consultant position, it was undisputed that UHG never hired anyone to fill that position and cancelled the requisition for the job. Thomas Dep., Ex. 33 (UHG Insurance Services Consultant requisition showing that the requisition was cancelled on May 3, 2010). Therefore, Thomas cannot meet the third or fourth prongs of her prima facie case with respect to that position.

Thomas also complained that she was denied a promotion to the Accumulator Research position. Amended Complaint, ¶¶38, 39. Thomas submitted no evidence that would create a genuine issue of material fact that she was qualified for this position. The requisition for the position indicated that the candidate had to be a "recognized team player." Rider Decl., Ex. 1 (requisition for Accumulator Research position). Thomas acknowledged this fact. Thomas Dep., p. 296. Thomas had been on the Initial CAP before applying for position and the Initial CAP related to Thomas's lack of professionalism at work. More importantly, there is no evidence that UHG promoted

persons of similar qualification who were not members of a protected class.  The only
evidence was that Rider hired candidates who were <u>more</u> qualified than Thomas.  Rider
Decl., ¶5.

Having failed to make out a <u>prima</u> <u>facie</u> case of race discrimination or failure to
promote based on race, summary judgment in favor of UHG on all of Thomas's race
discrimination claims is appropriate.[10]

---

[10]   Even if the Court had concluded that Thomas established her <u>prima</u> <u>facie</u> case of
race discrimination or failure to promote based on race, UHG set forth legitimate,
nondiscriminatory reasons for terminating and for failing to promote her, and Thomas
has submitted no evidence that those reasons were pretextual.

"To survive summary judgment, [the plaintiff] must adduce enough admissible
evidence to raise genuine doubt as to the legitimacy of a defendant's motives, even if
that evidence does not directly contradict or disprove a defendant's articulated reasons
for its actions." <u>Chapell v. Bilco Co.</u>, 675 F.3d 1110, 1119-20 (8th Cir. 2012) (internal
quotation omitted).  "To prove pretext, the employee must do more than show that the
employment action was ill-advised or unwise, but rather must show that the employer
has offered a phony excuse." <u>McNary v. Schreiber Foods, Inc.</u>, 535 F.3d 765, 769 (8th
Cir. 2008) (quotations omitted).  Courts "'do not sit as super-personnel departments
reviewing the wisdom or fairness of the business judgments made by employers, except
to the extent that those judgments involve intentional discrimination.'" <u>Doucette v.</u>
<u>Morrison County, Minn.</u>, --F.3d--, 2014 WL 3973082 (8th Cir. Aug. 15, 2014) (quoting
<u>Elam v. Regions Fin. Corp.</u>, 601 F.3d 873, 880-81 (8th Cir. 2010)).  The evidence
before this Court is that Thomas's co-workers complained to management repeatedly
about her inappropriate workplace behavior, (Wieman Decl., ¶¶11, 14, 22, 24; Gwin
Decl., ¶¶2-4), and Thomas admitted to some of this behavior.  Thomas Dep., p. 102,
146, Tr., p. 18.  UHG warned Thomas that if she continued to be disruptive, she would
be terminated.  Thomas Dep., Ex. 18 (Final CAP) ("Another incident of inappropriate
behavior (negative statements, distracting behavior, angry outburst, or challenging the
company to terminate her) may result in immediate termination.").  It is undisputed that
after being placed on the Final CAP, Thomas again engaged in disruptive behavior.
Wieman Decl., ¶30, Ex. 2 (notes of Carla Supanich regarding meeting with Thomas on
September 15, 2010 to discuss Thomas's inappropriate behavior during monthly team
meeting); Wells Decl., ¶¶11, 12; Moore Decl., ¶8; Gwin Decl., ¶4, Ex. 1 (complaint by
Gwin to Wieman dated October 27, 2010 regarding Thomas's ongoing, disruptive
conduct).

Thomas has not met her burden to show that UHG's reasons for not promoting
her and for terminating her were pretextual.

### 3.    Hostile Work Environment

Thomas alleged that she was subjected to a hostile work environment and that UHG created an "intimidating, hostile and offensive work environment" based on race Amended Complaint, ¶¶72-79.   To establish a <u>prima facie</u> case of hostile work environment, Thomas was required to show: "(1) she belongs to a protected group; (2) she was subject to unwelcome harassment; (3) a casual nexus exists between the harassment and the protected group status; (4) the harassment affected a term, condition, or privilege of employment; and (5) [UHG] knew or should have known of the harassment and failed to take proper action."   <u>Sallis v. University of Minn.</u>, 408 F.3d 470, 476 (8th Cir. 2005) (citation omitted); <u>Wenigar v. Johnson</u>, 712 N.W.2d 190, 205-206 (Minn. Ct. App. 2006) (describing same elements under the MHRA).

In determining whether a plaintiff has demonstrated that harassment affected  a term, condition or privilege of employment, the court looks at the totality of the circumstances, including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." <u>Woodland v. Joseph T. Ryerson & Son, Inc.</u>, 302 F.3d 839, 843 (8th Cir. 2002) (citing <u>Harris v. Forklift Sys., Inc.</u>, 510 U.S. 17, 21-23 (1993)); <u>Miles v. Norcott Hospitality Intern., LLC</u>, 963 F. Supp. 2d 878, 898-99 (D. Minn. 2013) ("[T]o establish an objectively hostile work environment [under the MHRA], the offending conduct must have been sufficient severe or pervasive.  More than a few isolated incidents are required.  A workplace permeated with discriminatory intimidation, ridicule, and insult is sufficiently severe to establish a hostile work environment.  The environment must be more than merely offensive,

immature or unprofessional; it must be extreme.") (internal quotation and citations omitted).  This standard is "relatively stringent" and intended to avoid the imposition of a "code of workplace civility."  <u>Woodland</u>, 302 F.3d at 843 (citing <u>Palesch v. Missouri Comm'n on Human Rights</u>, 233 F.3d 560, 567 (8th Cir. 2000)).  The harassment must be so intimidating, offensive, or hostile that it "poisoned the work environment."  <u>Scusa v. Nestle U.S.A. Co.</u>, 181 F.3d 958, 967 (8th Cir.1999) (citations omitted).

Thomas submitted no evidence that she was subjected to a hostile work environment based on her race.  Further, to the extent that Thomas may be basing this claim on her co-workers' complaints about her disruptive behavior, there is no evidence that any of the complaints were race-based.  More importantly, Thomas admitted to much of this disruptive conduct, making her co-workers' complaints objectively true. Thomas Dep., p. 102, 146, Tr., p. 18.  At the summary judgment motion hearing, Thomas argued that the complaints lodged against her were made by Caucasian co-workers, and "there were no other people complaining about [her]."  Tr., p. 17.  But this is not evidence of harassment.  If the complaints had been investigated and proven unfounded, that might be another matter.  But here, where Thomas herself admitted that at least some of the conduct complained of actually occurred, her Caucasian co-worker's complaints about the conduct cannot be characterized as "harassment."

Thomas has failed to provide any evidence of harassment or hostile work environment, and therefore the Court need not consider whether the harassment affected a term or condition of her employment.  Summary judgment on her hostile work environment claim should be granted.

### 4.      Retaliation and Aiding and Abetting Reprisal

Thomas alleged that UHG retaliated against her for her complaints of discrimination and aided and abetted retaliation against her.  Amended Complaint, ¶¶7, 30, n. 11, 44, n. 18, 68.

Title VII prohibits employers from retaliating against employees for opposing racial discrimination.  See 42 U.S.C. §2000(e)-3(a).  The elements of a prima facie retaliation claim under Title VII and the MRHA are: 1) plaintiff engaged in statutorily protected activity; 2) she was subjected to an adverse employment action; and 3) a causal connection existed between the two.  Jackman v. Fifth Judicial Dist. Dep't. of Correctional Servs., 728 F.3d 800, 804 (8th Cir. 2013) (citation omitted); Bahr v. Capella Univ., 788 N.W.2d 76, 81 (Minn. 2010) (citation omitted) (describing same elements of a prima facie case under the MHRA).  An adverse employment action is one that "a reasonable employee would have found . . . materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination."  Burlington N. & Santa Fe Ry. v. White, 548 U.S. 53, 68 (2006) (internal quotation omitted).  To establish causation, a plaintiff must show that the employer's "desire to retaliate was the but for cause of her termination."  Wright v. St. Vincent Health Sys., 730 F.3d 732, 737 (8th Cir. 2013) (citing University of Tex. Sw. Med. Ctr. v. Nassar, 133 S.Ct. 2517, 2528 (2013) (the causation standard applicable to a Title VII retaliation claim is a "but for" standard).[11]

---

[11]      Minnesota courts have not yet decided whether the "but for" standard described in Nassar applies to retaliation claims under the MHRA.  See Musolf v. J.C. Penney Co., Inc., Civ. No. 12-1591 (JNE/FLN), 2013 WL 5596421, at *7, n. 4 (D. Minn. Oct. 11, 2013).  Regardless of what standard is applied, Thomas's retaliation claim fails for lack of evidence and UHG's nonpretexual reasons for its employment actions.

If Thomas establishes a prima facie case of retaliation, the burden then shifts to UHG to produce a legitimate, non-retaliatory reason for its employment actions. Shanklin v. Fitzgerald, 397 F.3d 596, 603 (8th Cir. 2005), cert. denied, 546 U.S. 1066 (2005). If UHG meets its burden, then Thomas must prove that UHG's reasons are a pretext for discrimination. Clegg, 496 F.3d at 928 (the McDonnell Douglas framework is used to analyze a retaliation claim). To prove pretext, Thomas must discredit UHG's asserted reasons for its employment actions and demonstrate facts that permit drawing a reasonable inference that the real reason for the employment decisions was retaliation. Gilbert v. Des Moines Area Cmty. Coll., 495 F.3d 906, 918 (8th Cir. 2007) (citation omitted).

Thomas alleged that as a result of her complaints about racial discrimination, she was demoted and "placed under surveillance" by white co-workers. Amended Complaint, ¶18. Thomas did not specifically allege that UHG placed her on the CAPS to retaliate against her for complaining about racial discrimination. Nonetheless, Thomas's allegation that the CAPS were "unwarranted" implied that she believed that the CAPS were imposed to punish her for speaking out about UHG's alleged discriminatory treatment of African-American employees. See Amended Complaint, ¶¶19, n. 4, Ex. 5 (Thomas's response to Elevated CAP), Ex. 12 (Thomas's letter to UHG after termination complaining that UHG's investigator was unfamiliar with the company's non-retaliation policy).

UHG argued that Thomas failed to meet the second and third prongs of the prima facie case because most of the harms she complained of, such as not being allowed to work from home, were trivial and did not constitute "adverse actions." Defs.' Mem., pp.

23-24.   Further, although the CAPS and termination could be considered adverse actions, Thomas failed to show a causal connection between those actions and her legally protected activities.  Id., p. 24.

This Court agrees that there is no evidence of a causal connection between Thomas's complaints of racial discrimination and UHG's employment actions. Thomas's complaints of racial discrimination do not "insulate [her] from discipline for violating [UHG's] rules."  Chivers v. Wal-Mart Stores, Inc., 641 F.3d 927, 933 (8th Cir. 2011) (quotation omitted); Noel v. AT&T Corp., Civ. No. 12-1643, 2014 WL 117606, at *14 (E. D. Mo. Jan. 13, 2014) (placing an employee on a performance improvement program is not, in itself, discriminatory treatment).   Thomas's allegations that UHG's actions were retaliatory are unsupported by admissible evidence and ignore the fact that by her own admission she engaged in disruptive behavior to which UHG objected.

However, even assuming arguendo that Thomas made a prima facie showing of retaliation, UHG has provided extensive evidence of its legitimate, non-discriminatory reasons for its employment actions.  See, Sect. I, supra.   As to Thomas's allegations regarding specific acts of retaliation, the Court notes that the undisputed evidence is that Thomas was not demoted, her position had been incorrectly coded and when the mistake was discovered in June 2008, UHG recoded the position.  Wieman Decl., ¶8, Wells Decl., ¶5.  The title change affected all employees in the same position and did not affect pay, benefits or job duties.  Wieman Decl., ¶8.

Further, as to Thomas's allegation that she was placed under the "surveillance" of a white employee, the undisputed evidence is that Wieman asked Jennifer Carlyle to audit Thomas's work after receiving a complaint about frequent errors in her work from

a client.  Wieman Decl., ¶19.  Wieman later asked Sharon Wegener to audit the work of all of the Associate Analysts.  Id.  Wieman's goal was to have 100% of the work product reviewed internally by Wegener.  Id.  Thomas had more clients than other Associate Analysts (although according to Wieman, she had a comparable amount of actual work), and as a result, the audits would necessarily involve more of Thomas's work.  Id.; Wegner Decl., ¶¶4-9.  Audit results were not tracked and no one was disciplined for errors discovered during the audits.  Wieman Decl., ¶20; Wegener Decl., ¶6.

At the motion hearing, Thomas asserted that her work was being audited by "the person that they only let stop working from [home] every day to working on days that it snowed."  Tr., p. 20.  Thomas appeared to be arguing that it was unfair to allow Wegener to audit her work because she had complained about Wegener working from home.  The only evidence in the record was that Wegener worked at home five days the previous year due to inclement weather.  Wegener Decl., ¶11.  Whether Wegener harbored feelings of resentment toward Thomas is irrelevant in light of the fact that Thomas was not being singled out for review, Wegener reviewed the work of every member of the department, and there were no repercussions for errors that were identified.  There is no evidence that Wegener treated Thomas any differently than any other team member.

Because Thomas's hostile work environment and reprisal claims fail, there is no need to dwell at length on her claim of aiding and abetting hostile work environment and reprisal.  Amended Complaint, ¶¶68-71.  The MHRA states in relevant part, "[i]t is an unfair discriminatory practice for any person: (1) [i]ntentionally to aid, abet, incite, compel, or coerce a person to engage in any of the practices forbidden by this chapter."

Minn. Stat. § 363A.14.   Consequently, "retaliatory acts are necessary to prevail on a claim of aiding and abetting discrimination."  See Boone v. City of St. Paul, Civ. No. 09-1920 (DSD/AJB), 2011 WL 1641899, at *7 (D. Minn. May 2, 2011) (citing Smith v. DataCard Corp., 9 F. Supp. 2d 1067, 1081 (D. Minn. 1998), Lussier v. Wal-Mart Stores, Inc., Civ. No. 06-1395 (ADM/RLE), 2007 WL 2461932, at *6 (D. Minn. 2007)).   Having rejected Thomas's underlying retaliation and hostile work environment claims, her aiding and abetting claims fail, as well.

For all of these reasons, summary judgment should be granted on Thomas's claims of retaliation and aiding and abetting reprisal.

## B.   Intentional Infliction of Emotional Distress

Thomas alleged that UHG's actions constituted intentional infliction of emotional distress and that she suffered "personal injury, emotional distress, mental anguish, depression, sleeplessness, humiliation, loss [sic] wages, loss [sic] reputation, pain and suffering and other serious injur[ies] as a result of UHG's "outrageous conduct." Amended Complaint, ¶¶80-88.

To prevail on a claim of intentional infliction of emotional distress a plaintiff must establish: (1) the conduct is extreme and outrageous; (2) the conduct that is intentional or reckless; (3) the conduct caused emotional distress; and (4) the distress must be severe.  Hubbard v. United Press Int'l, Inc., 330 N.W.2d 428, 438–39 (Minn.1983) (citing Restatement (Second) of Torts § 46(1) (1965)).   "Extreme and outrageous" conduct must be "so atrocious that it passes the boundaries of decency and is utterly intolerable to the civilized community."  Id. at 439.  "A complainant must sustain a similarly heavy burden of production in [her] allegations regarding the severity of his mental distress.

Expounding the meaning of 'severe emotional distress,' the Restatement commentary says in part that '[t]he law intervenes only where the distress inflicted is so severe that no reasonable man could be expected to endure it.'" Id. (citation omitted).

No reasonable juror could conclude that UHG's conduct toward Thomas was extreme and outrageous.  In fact, Thomas was given many chances to improve her conduct and meet UHG's legitimate expectation that she conduct herself professionally in its workplace.  Further, Thomas submitted no evidence that she suffered the "severe distress" required to support a claim of intentional infliction of emotional distress. Thomas responded to an interrogatory regarding her physical symptoms, stating that she became "numb, nervous, anxious and tearful at work."  Her chest started burning and became tight.   Jezierski Decl., Ex. I (Thomas's answers to interrogatories). Thomas testified that these symptoms did not prevent her from working or caring for her family.[12]  Thomas Dep., p. 346.  These alleged symptoms, which are not supported by any factual evidence in the record, are insufficient to support a claim for intentional infliction of emotional distress.  See, e.g., Besett v. Wadena County, Civ. No. 10–934 (JRT/LIB), 2010 WL 5439720 at *17 (D. Minn. Dec. 7, 2010) (gathering cases rejecting depression, a fear of answering door or telephone, impaired ability to trust, damaged relationships with children, vomiting, skin rashes, stomach disorders, high blood pressure, crying spells, avoidance of social interaction, humiliation, embarrassment, insomnia, unsteady nerves, difficulty sleeping, anxiety, lightheadedness, and shortness of breath as sufficient to support a claim for intentional infliction of emotional distress); Langeslag v. KYMN, Inc., 664 N.W.2d 860, 868 (Minn. 2003) (rejecting stomach pain,

---

[12]     At the summary judgment hearing, Thomas reported working ten hours a day. Tr., pp. 5, 6.

hair loss, weight loss and skin rash as sufficient evidence of intentional infliction of emotional distress).

### C.   Common Law Claims

UHG argued that Thomas's common law negligence claims were preempted under the MHRA.  UHG Mem., pp. 25-26.

"[T]he MHRA preempts a common law cause of action if: "(1) the factual basis and injuries supporting the common law claim also would establish a violation of the MHRA; and (2) the obligations the defendant owes to the plaintiff, as a practical matter, are the same under both the common law and the MHRA." Pierce v. Rainbow Foods Group, Inc., 158 F.Supp.2d 969, 975–76 (D. Minn. 2001).  Where a complaint does not allege any facts or injuries that would fall outside the realm of the protection of the MHRA, then those claims are preempted.  Radcliffe v. Securian Fin. Grp., Inc., 906 F. Supp. 2d 874, 893-94 (D. Minn. 2012); Beliveau v. St. Paul Area Council of Churches, Civ. No. 10-3592 (DWF/JJK) (D. Minn. Dec. 23, 2010) (finding that the MHRA preempted common law claims of negligence, negligent training, retention and supervision where none of the facts or injuries alleged in connection with these claims fell outside the realm of protection of the MHRA).

Here, Thomas's claims for negligence, negligent supervision, training, retention and hiring, and negligent infliction of emotional distress are boilerplate claims that do not allege any specific facts or injuries at all, much less facts or injuries that fall outside the scope of Thomas's MHRA and Title VII claims.  As a result, the Court concludes that the claims are preempted.  However. even if the claims were not preempted, the claims fail on their merits for the reasons described below.

### 1.   Negligence

Thomas asserted a "bare bones" negligence claim, stating only that UHG had a duty to protect her from harm and to warn her of harm and that by failing in these duties, Thomas suffered unspecified "personal and physical injury" pain, emotional distress, mental anguish, depression, humiliation, embarrassment, pain and suffering, loss of reputation, loss of wages and benefits and "other serious injuries."   Amended Complaint, ¶¶89-94.  To succeed on a negligence claim, Thomas was required to show (1) UHG had a legal duty of care; (2) that UHG breached that duty; (3) the breach was the proximate case of Thomas's harm; and (4) damages.   As noted throughout this Report and Recommendation, Thomas has not come forward with any evidence to support any of these elements.  As a result, her claim fails.

### 2.   Negligent Supervision, Training, Retention, Hiring

Thomas alleged that UHG engaged in negligent supervision and training, retention and hiring of its managers and employees.  Amended Complaint, ¶¶95-105. Thomas appears to be referring to the managers who supervised her and UHG's alleged failure to adequately investigate her complaints of discrimination, although the Amended Complaint is silent regarding the identity of these individuals.

Under Minnesota law, to prove negligent supervision, a plaintiff must show that an employer failed "to exercise ordinary care in supervising the employment relationship so as to prevent the foreseeable misconduct of an employee causing harm to others." Mandy v. Minnesota Mining & Mfg., 940 F. Supp. 1463, 1471 (D. Minn. 1996) (citation and internal quotation marks omitted) (applying Minnesota law).  To maintain an action for negligent supervision, however, "the existence of a threat, or reasonable

apprehension of actual <u>physical injury</u> is required." <u>St. Hilaire v. Minco Prods., Inc.</u>, 288 F. Supp. 2d 999, 1010 (D. Minn. 2003) (emphasis in original) (citation and internal quotation marks omitted) (applying Minnesota law).   The record is devoid of any evidence that there ever existed a threat to Thomas of physical injury or that she was, in fact injured.  For these reasons, this claim fails.

Minnesota does not recognize a claim for negligent training.  <u>Halsne v. Avera Health</u>, Civ. No. 12-2409 (SRN/JJG), 2013 WL 3088588, at *5, n. 1 (D. Minn. June 18, 2013) (citing <u>Johnson v. Peterson</u>, 734 N.W.2d 275, 277 (Minn. Ct. App. 2007) ("[C]urrent Minnesota law does not recognize a cause of action for negligent training."); <u>Eischen v. Crystal Valley Co-op</u>, 835 N.W.2d 629, 633 (Minn. Ct. App. 2013) ("Minnesota law does not recognize a cause of action for negligent training.") (citation omitted).  Therefore, summary judgment on that claim should be granted.

The tort of negligent retention occurs when an employer has notice that an employee poses a threat of injurious conduct and fails to take steps to protect third parties. <u>Yunker v. Honeywell, Inc.</u>, 496 N.W.2d 419, 423–24 (Minn. Ct. App.1993), <u>rev</u>. <u>denied</u>, (Minn. Apr. 20, 1993) ("Negligent hiring and negligent retention do not rely on the scope of employment but address risks created by exposing members of the public to a potentially dangerous individual.  These theories of recovery impose liability for an employee's intentional tort, an action almost invariably outside the scope of employment, when the employer knew or should have known that the employee was violent or aggressive and might engage in injurious conduct.") (internal citation and citations omitted).  As noted previously, Thomas has provided no evidence that she was injured by any of the conduct of UHG's employees.  Nor is there any evidence that any

of the UHG employees referenced in the Amended Complaint were acting outside the scope of their employment.  As a result, Thomas's negligent retention claim fails.

Negligent hiring is defined as the

> negligence of an employer in placing a person with known propensities, or propensities which should have been discovered by reasonable investigation, in an employment position in which, because of the circumstances of the employment, it should have been foreseeable that the hired individual posed a threat of injury to others.

Ponticas v. K.M.S. Investments, 331 N.W.2d 907, 911 (Minn. 1983).  The type of injury needed to sustain such a claim is bodily injury, or the threat of bodily injury.  Ludwig v. Northwest Airlines, Inc., 98 F. Supp. 2d 1057, 1072 (D. Minn. 2000).

There is no evidence to support Thomas's claim of negligent hiring.  In fact, it is not even evident from her Amended Complaint who she is claiming was negligently hired.  Her claim appears to be based on a theory that Wells, Wegener, Wieman and Hagan and perhaps others were biased.  But there is no evidence that is the case, and more importantly, Thomas has not shown that she suffered any injuries as a result of their conduct.  Summary judgment on this claim should be granted.

### 3.    Negligent Infliction of Emotional Distress

Thomas claimed that UHG placed her in a "zone of danger" and that it "maliciously, recklessly and intentionally" violated her rights, causing her emotional distress and physical injury.  Amended Complaint, ¶¶106-108.  Thomas did not explain what this "zone of danger" was or what physical injury she suffered.  Id.

To prove negligent infliction of emotional distress, Thomas must establish the four elements of a negligence claim: the existence of a duty of care, breach of that duty, injury and that the breach was the proximate cause of her injuries.  Thomas must then

show that she: (1) was within a "zone of danger" of physical impact; (2) reasonably feared for her safety; and (3) suffered severe emotional distress with attendant physical manifestations.  See Engler v. Illinois Farmers Ins. Co., 706 N.W.2d 764, 767 (Minn. 2005); K.A.C. v. Benson, 527 N.W.2d 553, 557 (Minn. 1995).  Thomas must show "a situation where it was abundantly clear [she] was in grave personal peril for some specifically defined period of time."  K.A.C., 527 N.W.2d at 557.  A claim for negligent infliction of emotional distress is intended to remedy "physically risky, calamitous events."  Smith v. DataCard Corp., 9 F. Supp. 2d 1067, 1082 (D. Minn. 1998). Summary judgment on a claim of negligent infliction of emotional distress is warranted if a plaintiff fails to meet the high standard of proof required for such a claim.  Strauss v. Thorne, 490 N.W.2d 908, 913 (Minn. Ct. App. 1992).

There are no facts in the record to support this claim by Thomas, much less contested facts that would preclude summary judgment.  As a result, this claim fails.

### D.   Intentional Interference with an Economic Advantage

Thomas alleged that UHG interfered with Thomas's business relationship with UHG by retaliating against her, in violation of its own rules and contractual agreement with her.   Amended Complaint, ¶¶109-113.   To succeed on a claim of tortious interference with an economic advantage a plaintiff must prove: (1) the existence of a reasonable expectation of economic advantage; (2) defendant's knowledge of that expectation; (3) defendant intentionally interfered with plaintiff's reasonable expectation of economic advantage, and the intentional interference is either independently tortious or in violation of a state or federal statute or regulation; (4) in the absence of a wrongful act by the defendant, it is reasonably probable that plaintiff should have realized the

economic advantage; and (5) the plaintiff sustained damages.   <u>Gieske ex. rel. Diversified Water Diversion, Inc. v. IDCA, Inc.</u>, 844 N.W.2d 210, 219 (Minn. 2014). Thomas has alleged no facts to support this claim, much less uncontested facts.  For that reason, the claim should be dismissed.  The claim fails for the additional reason that a party (in this case, UHG) cannot interfere with its own contract.  <u>Nordling v. Northern States Power Co.</u>, 478 N.W.2d 498, 505 (Minn. 1991).

For all of these reasons, summary judgment on this claim be granted.

### E.   <u>Defamation</u>

Thomas alleged that Gwin's email to Wieman dated October 27, 2010, in which Gwin complained about Thomas's conduct, was defamatory.   Amended Complaint, ¶¶114-118.  Under Minnesota law, "the elements of defamation require the plaintiff to prove that a statement was false, that it was communicated to someone besides the plaintiff, and that it tended to harm the plaintiff's reputation and to lower [her] in the estimation of the community."  <u>Stuempges v. Parke, Davis & Co.</u>, 297 N.W.2d 252, 255 (Minn. 1980).  "[T]rue statements, however disparaging, are not actionable."  <u>Id.</u>  A "plaintiff cannot succeed in meeting the burden of proving falsity by showing only that the statement is not literally true in every detail.  If the statement is true in substance, inaccuracies of expression or detail are immaterial."  <u>See</u> <u>Jadwin v. Minneapolis Star & Tribune Co.</u>, 390 N.W.2d 437, 441 (Minn. Ct. App. 1986).  Thomas has not made a <u>prima facie</u> showing of defamation.  She does not allege that her reputation was harmed as a result of Gwin's email to Wieman or that it "lowered her in the estimation of the community."   Nor has Thomas submitted admissible evidence showing that Gwin's statement to Wieman was false.

Thomas's defamation claim fails for the additional reason that Gwin's statement was privileged.  The existence of privilege is a matter of law for the Court to decide. <u>Chambers v. Travelers Cos.</u>, 668 F.3d 559, 564 (8th Cir. 2012) (citing <u>Bahr v. Boise Cascade</u>, 766 N.W.2d 910, 920 (Minn. 2009)).  Allegedly defamatory statements are privileged if they are made on a proper occasion, for a proper purpose, and on probable cause.  <u>Id.</u>  Furthermore, "statements made in particular contexts or on certain occasions should be encouraged despite the risk that the statements might be defamatory."  <u>Bol v. Cole</u>, 561 N.W.2d 143, 149 (Minn. 1997).  In applying the qualified privilege, the Minnesota Supreme Court has held:

> Communications between an employer's agents made in the course of investigating or punishing employee misconduct are made upon a proper occasion and for a proper purpose, as the employer has an important interest in protecting itself and the public against dishonest or otherwise harmful employees.

<u>McBride v. Sears Roebuck & Co.</u>, 235 N.W.2d 371, 374 (Minn. 1975).

As defendants pointed out, Gwin was merely reporting to Wieman, his manager, that Thomas was being loud, disruptive and making derogatory comments about UHG management.  Defs.' Mem., p. 28.  Under these facts, the Court concludes that Gwin's statement to Wieman was protected by the qualified privilege.  Thomas can only overcome this qualified privilege if she can demonstrate that Gwin acted with actual malice.  <u>Lewis v. Equitable Life Assurance Soc'y of the U.S.</u>, 389 N.W.2d 876, 889 (Minn. 1986).

"Actual malice requires a showing that the defamatory statements are made from ill will and improper motives, or causelessly and wantonly for the purpose of injuring the plaintiff."  <u>Boise Cascade</u>, 766 N.W.2d at 920 (internal alterations and quotation marks

omitted).   When a qualified privilege exists, to survive a motion for summary judgment, a plaintiff must present at least some evidence from which it might be inferred that the defendant knew the statement at issue was false and some evidence of ill feeling between the parties.   Sherman v. Rinchem Co., Inc., 687 F.3d 996, 1009–10 (8th Cir. 2012) (citing Frankson v. Design Space Int'l, 394 N.W.2d 140, 144 (Minn.1986)).   Here, Thomas has offered no evidence to defeat the qualified privilege that attaches to Gwin's statement.   Gwin stated under penalty of perjury that he felt no ill will or malice towards Thomas and he only complained because Thomas was disruptive and he hoped she would change her behavior.   Gwin Decl., ¶¶5, 6.   Thomas submitted no evidence to the contrary.

Furthermore, while Thomas may disagree with Gwin's opinion that her conduct was disruptive, that is not enough to defeat the qualified privilege.   "[N]umerous courts, including the Minnesota Supreme Court, have held that expressions of opinion, even if defamatory, are constitutionally protected."   Lund v. Chicago & Nw. Transp. Co., 467 N.W.2d 366, 368 (Minn. Ct. App. 1991), rev. denied, (Minn. June 19, 1991) (citations omitted).   "[S]tatements [that] cannot be reasonably interpreted as stating actual facts[ ] are absolutely protected by the First Amendment."   Hunt v. University of Minn., 465 N.W.2d 88, 94 (Minn. Ct. App. 1991).   For example, in McGrath v. TCF Bank Sav., FSB, 502 N.W.2d 801, 808 (Minn. Ct. App. 1993), modified on other grounds, 509 N.W.2d 365 (Minn. 1993), the court found that calling a prospective employee a "troublemaker" was a protected opinion statement because the term "lacks precision and specificity." "[I]f it is plain that the speaker is expressing a subjective view, an interpretation, a theory, conjecture, or surmise, rather than claiming to be in possession of objectively

41

verifiable facts, the statement is not actionable." <u>Marchant Inv. & Mgmt. Co., Inc. v. St. Anthony West Neighborhood Org., Inc.</u>, 694 N.W.2d 92, 95 (Minn. Ct. App. 2005), <u>abrogated on other grounds</u> by <u>Liendecker v. Asian Women United of Minn.</u>, 848 N.W.2d 224 (Minn. 2014).  Therefore, Gwin's subjective opinion that Thomas's conduct was "a disturbance" is protected under the First Amendment.

For all of these reasons, summary judgment on Thomas's defamation claim against Gwin is appropriate.

## IV.  RECOMMENDATION

Based on the foregoing, and all the files, records and proceedings herein,

**IT IS HEREBY RECOMMENDED** that:

1.    Defendants' Motion for Summary Judgment [Docket No. 119] be GRANTED.

2.    This matter be dismissed with prejudice.

Dated: September 16, 2014                       *Janie S. Mayeron*
                                                JANIE S. MAYERON
                                                United States Magistrate Judge

## NOTICE

Under D. Minn. LR 72.2(b) any party may object to this Report and Recommendation by filing with the Clerk of Court, and serving all parties by **September 30, 2014**, a writing which specifically identifies those portions of this Report to which objections are made and the basis of those objections.  A party may respond to the objecting party's brief within 14 days after service thereof.  All briefs filed under this Rule shall be limited to 3500 words.  A judge shall make a de novo determination of those portions to which objection is made.  This Report and Recommendation does not constitute an order or judgment of the District Court, and it is therefore not appealable directly to the Circuit Court of Appeals.